## STEPHEN MALCEK V. THE STATE.

### No. 739.    Decided December 2.

1. **Murder—Evidence—Defendant as Witness.**—On a trial for murder of his wife, where defendant has testified in his own behalf, it is not error, on cross-examination, to permit the prosecution to elicit from him the fact that his wife had sued him for a divorce on account of his adultery with a woman who had staid at his house.

2. **Same—Best Evidence.**—An objection to the above evidence, that the petition for divorce was the best evidence, is not maintainable. Defendant certainly knew the ground alleged for the divorce, and could state it without the petition.

3. **Same—Charge.**—Where it was objected to the charge that it did not instruct the jury as to the purpose of admitting evidence of a suit for divorce brought against defendant by his wife, the deceased, *Held*, such charge was unnecessary, inasmuch as the jury could have considered it for no other purpose but to show the inharmonious relations existing between the parties.

4. **Same—Leading Questions.**—On a trial for murder, where a witness had testified to having heard the voice of a woman at defendant's house the evening preceding the homicide, and counsel for the State asked the witness the following questions, "Did the noise sound as if the person was in joy or distress? Was it as if she was laughing or crying; or as if she was suffering pain or enjoying pleasure? Or was she making a mere idle noise, as if nothing was the matter with her?" and the witness answered, "It sounded like a woman's voice crying," *Held*, that the questions were not leading nor suggestive of the desired answer.

5. **Same—Conduct of Judge.**—On a trial for murder, where defendant's counsel had made frequent objections to questions propounded by the prosecution, to the effect that they were leading, and the trial judge wrote out certain questions and handed them to the interpreter to propound to the witness, *Held*, that such conduct on the part of the judge was not obnoxious to the objection that it was calculated to impress the jury with the idea that the judge believed the defendant was guilty and that he desired him to be convicted. His conduct simply showed that in regard to important matters he was desirous that the questions and answers should not be objectionable.

6. **Same—Suicide—Accidental Death—Corpus Delicti.**—On a trial of a defendant for murder of his wife, where the evidence showed a round wound in the head about the size of a dollar, which drove the skull down upon the brain, that there were scratches and bruises on the throat and neck, and that the body was found in the cow pen, *Held*, the evidence excludes the theory of suicide, or that she was killed by some agency other than human.

7. **Same—Evidence Sufficient.**—See facts stated which, in the opinion of the court, are sufficient to establish a murder, and the further fact that defendant, who was the husband of the murdered woman, was the party who committed the murder.

APPEAL from the District Court of Bell. Tried below before Hon. W. A. BLACKBURN.

This appeal is from a conviction for murder of the second degree, the punishment assessed being ten years in the penitentiary.

The murdered party was a woman (Marize Malcek), appellant's wife.

The parties were Bohemians, and they were married in the old country in 1871. They had lived thirteen years in Texas, part of

which time they lived in Falls County. In Falls County they had several difficulties, and the wife at one time left her husband and instituted two criminal proceedings against him, one for aggravated assault upon her, and the other for adultery with a woman who was living at their house. She also filed a suit for divorce against her husband and left him. Her husband pleaded guilty to the case of aggravated assault and was fined. The adultery case was dismissed, and the divorce case was withdrawn. The wife then went back to live with him.

Steve Kovar, a witness for the State, testified, that he was a nephew of Mrs. Malcek, the deceased, and that he had been raised by these parties to manhood. That in June, 1888, the defendant, Malcek, told him that if his wife did not go away he would kill her, even if he was hung for it. These parties moved to Bell County just about Christmas, 1892. It was in proof that the neighbors knew of several difficulties which they had had after they moved to Bell County. On the evening of the 26th of April, 1893, which was the last time any of the neighbors saw the deceased alive, several of them testified to hearing a fuss and quarrelling over at defendant's house. And some of the State's witnesses testified to seeing the defendant whipping his wife with a whip that evening. The next morning early, defendant went to a neighbor's and told him that his (defendant's) wife was dead in the cow pen, and this neighbor went with him to the place, and he and the neighbor carried the body into the house. A justice of the peace was sent for to hold the inquest. He testified that he reached there on April 27th; found the body in the house; examined the body with Dr. ――――. There was a wound on the forehead, above the right eye, about the size of a dollar. The wound was round, and appeared to have been made with a round, blunt instrument that was higher in the center than on the edge. The skin was drawn tight against the skull in the center, and a ridge around the outer edge of the wound. It was black and bruised. The doctor cut the wound up and down and across, and laid the skin back, and we examined the skull and found it fractured. One side of the skull bone was a little higher than the other, and protruded about the one-sixteenth of an inch. Her throat and neck were scratched and black. We undressed her, and the lower part of the abdomen was bruised, about as large as a man's hand, on the right side.

Stephen Malcek, defendant, testified for himself: "My name is Stephen Malcek; Marize Malcek was my wife; she is now dead. I married my wife in the old country in 1871, on her mother's place; we have lived together ever since. I was working for her mother at the time of our marriage. We have lived in America about thirteen years. My wife left me three or four times, the first time at Barclay. I lived in Austin County six years. My wife left me in Austin County.

We moved from Austin County to Falls County, and lived there about six years, and moved to Bell County about Christmas, 1892. My wife left me. I did not leave her. Other people made her leave me when she got money. She left me in Falls County just before we moved to Bell County, and went to Marlin and staid about a week. That is the longest time she has ever staid away from me since we were married. Steve Kovar is my wife's nephew. I did not tell Steve Kovar, in my yard in 1888, I would kill my wife if she did not leave me, if I was hung for it. Steve told a lie. Me and wife talked about getting a widow woman to come and pick cotton, and she agreed to it. I brought the woman to my house one evening, and my wife left the next morning. The woman had nothing to do with my wife's leaving. I went to Marlin after my wife and brought her home in a wagon. My wife and I rode in the front end of the wagon and the woman rode in the rear end of the wagon. This was one or two weeks before we moved to Bell County. The first night I moved to Bell County there was hallooing at my house. We had a party that night. It is the custom of our people to give a party when we first move to a place. I went to Bartek's house and got a pint of alcohol, and made some whisky. F. Bartek, Cocek, myself and wife, and a man from Falls County were at the party. I paid Bartek back the alcohol. I remember the trouble between myself and wife at F. Bartek's house. Wife was quarrelling with me and making fun of me at home. I got tired and started to leave. I got on my mule and rode down to Mr. Bartek's house, and soon after I got there my wife came and began to tease me and make fun of me. I told her to hush, and she would not. I started to hit her with the pipe in my hand. Bartek and another man caught me and threw me against the wall. Bartek took me to the gate, and I went home. Wife and I were in Temple on Tuesday before her death. We bought a one-half gallon of alcohol and half keg of beer. Wife bought some stove utensils, which we took home. On our way home we stopped at Seaton, about two miles west of our house, and got some beer. Wife drank three glasses and I drank two. We got home about sundown, and staid at home that night. On Wednesday morning, April 26, 1893, I was plowing cotton in the field south of the house. The rows run up to the house. I did not plow that afternoon, but staid around the house. I saw Anton and Frank Chemocky. They came to the gallery and ate their dinner on the gallery. My wife came out and shook hands with them, and went back into the house. I brought some whisky out and we all took a drink. They left my field about 2 p. m., and went into another field. They were still in sight of my house. Wife was working around the house and in the house. She did not make any noise till about 4 o'clock. She came out to the wood pile where I was cutting wood and wanted whisky. I refused to give her whisky; then she commenced to quarrel and make a noise. She

went on back into the house and working at things in the house.
After a little I went in the house and talked to wife about things in the
house. We did not quarrel in the house. I then gave her a drink of
whisky in a glass and went off in the field looking at the crops, and
crossed over into Bartek's field and looked at his crop. This was
about 5 o'clock, I guess. I did not notice the clock to see the time. I
got back to the house about sundown. Wife was on the gallery, I
think. I did not see her when I first got home, but directly saw her
on the gallery. She asked me for whisky and I gave her some in a
glass just before I went to bed, about 7 o'clock. I guess my wife
asked me for whisky again, and I refused to give it to her then. I had
the whisky and alcohol locked up in a homemade trunk, and I had the
key. When I refused she made a racket and noise. I opened the chest
and took it out and gave it to her and said to her: 'Now you have it;
if you drink the toddy you won't have it to-morrow,' and I went to
bed. I saw her come in and pour the alcohol in a vessel and drink.
I was lying on the bed when she drank the alcohol. I went to sleep,
and that is the last time I saw her alive. I woke up in the night about
11 o'clock and felt on the bed where she usually slept and found that
she was not there. I then got up and lit a lamp and looked through
all three of the rooms for her and on the gallery, and did not find her.
She was in the habit of getting up in the night and smoking. She
usually sat in the rooms or gallery to smoke. I did not go outside of
the house to look. Not finding her in the house, I blew out the light
and went back to bed. I woke up next morning about daylight. I
first went and fed my hogs before I found her. I was then going to the
pasture for my mules, and I saw wife lying in the cow lot. When I
saw my wife I was very much frightened. I did not go up to her nor
touch her. I went at once to Bartek's. I wanted Bartek to go with
me to see if my wife was dead. Bartek was not at home and I got
Cocek, who lived at Bartek's, to go back with me. Wife was lying with
face on the ground and hand under her. I was scared, and don't
remember which hand was under her. When I called her and she did
not answer, I thought she must be dead. She had a wound on forehead
about as big as a 25-cent piece, and a bruise on right leg. After we
put her in the room, I run out the cats and locked the door and went
to Bartek's to get a horse to go after the justice of the peace to hold
inquest. I went to Seaton and got some one to go after the justice. I
sent for a coffin and helped to dress her for burial. I did not go to the
burial, as I was arrested before the burial. I owned some cows and
calves and two mules. The mules would kick when strangers came
around. All four of the gates to lots and pasture were open. The
cow trough is made of plank, about three feet high and ten feet long,
and a few steps from the gate near which my wife was lying. The
mules were in the pasture when I went to bed, and I saw the mules

in the pasture before night. The mules were gentle for me to handle, but if any one else opened the gate they would kick. The neighborhood road to Cyclone passes right by my cow lot gate. In the fall of 1892 my wife made complaint against me in Falls County, charging me with aggravated assault upon her, and I pleaded guilty. I gave Mr. Baker the money and he paid it—$48—for me. My wife also made complaint against me, charging me with adultery with the woman at our house. She also sued me for a divorce, alleging adultery with the woman living at our house. The cases were all pending at the same time. I pleaded guilty to the aggravated assault, the adultery case was dismissed and the divorce case was withdrawn, and I did not go into court. I took my wife home from Marlin that evening in a wagon. My wife got drunk whenever she could get it, and when she was drunk she was quarrelsome and fussy."

Appellant reserved two bills of exception to the rulings and proceedings of the court with regard to the admission of testimony over his objection. The first was to the following question asked by the district attorney on cross-examination of defendant as a witness in his own behalf: "Did not your wife bring suit for divorce against you in Falls County on the charge of adultery with the woman that lived at your house?" Defendant answered, "yes." The objection urged to this evidence was that the petition for divorce was the best evidence to show the grounds of the divorce. Defendant's second bill of exception shows that after John Hruska had testified that he had heard a woman's voice in the direction of appellant's house on the evening before the death of Mrs. Malcek, the district attorney asked this question: "Was the sound you heard a sound of distress?" Appellant objected, because leading and suggestive. Then the judge, of his own motion, prepared the following question in writing and came down from the bench to where the interpreter was sitting, handed him the paper upon which it was written and told him to ask it, to wit: "Did the noise sound as if the person was in joy or distress; was it as if she was laughing or crying, or if she was suffering pain or enjoying pleasure, or was she making a mere idle noise, as if nothing was the matter with her?" Appellant objected to this question, because leading and suggestive, and called for the opinion of the witness. Objection was overruled, and witness answered: "It sounded like a woman's voice, crying."

*McMahon & McMahon*, for appellant.—The petition for divorce was the best evidence of the grounds upon which it was based.

1. This is the best evidence, and until it is shown that such evidence can not be had, secondary evidence or parol evidence can not be resorted to. Valentine v. The State, 6 Texas Crim. App., 439; Chester v. The State, 23 Texas Crim. App., 577; Hunter v. The State, 13

Texas Crim. App., 16; White v. The State, 14 Texas Crim. App., 449; Porter v. The State, 1 Texas Crim. App., 394; 1 Greenl. on Ev., sec. 82.

If this evidence has been illegally admitted, then we submit that this conviction should be set aside without inquiring whether there is sufficient legal evidence to sustain the conviction, or whether the verdict was influenced by the illegal evidence. Hester v. The State, 15 Texas Crim. App., 567; Preston v. The State, 4 Texas Crim. App., 200; Haynie v. The State, 2 Texas Crim. App., 168; Somerville v. The State, 6 Texas Crim. App., 433; McWilliams v. The State, 44 Texas, 116.

In this connection, we submit, that, even though this testimony had been properly admitted, it was the bounden duty of the court to have explained to the jury the object and purposes for which it was admitted, and should have limited it by the charge to the purposes for which it could be legally considered. The court's failure to so instruct the jury is radical and reversible error, even though the charge be not excepted to, and it is presented in this court for the first time. Davidson v. The State, 22 Texas Crim. App., 382; Burks v. The State, 24 Texas Crim. App., 330; Littlefield v. The State, Id., 169; Higgenbotham v. The State, Id., 508; Washington v. The State, 23 Texas Crim. App., 338; Maines v. The State, Id., 576.

2. The court erred in overruling defendant's objections to the question asked the witness John Hruska, because the question called for the opinion of the witness, and as he had not qualified as an expert on sound, and had not brought himself within the exception to the rule, his opinion was inadmissible. Lumbkin v. The State, 12 Texas Crim. App., 341; Campbell v. The State, 10 Texas Crim. App., 560; Koblenschlag v. The State, 23 Texas Crim. App., 264; Walker v. The State, 25 Texas Crim. App., 448.

We further submit that the conduct of the court with reference to preparing and asking the above question was calculated to injure appellant.

"The court, in the trial of a case before it, is presumed to be, and should be, an impartial arbiter as to the legal rights of the parties," and should take no part in the prosecution or defense of a case on trial before it. In this case, it seems, the trial judge forgot this responsible and all important duty reposed in him, for his conduct was calculated to impress upon the jury that he was on the side of the prosecution. The trial judge can not assist in the prosecution of a prisoner tried before him, however much he may think he deserves conviction. He must "hands off." He can not assist the district attorney in examining the witnesses and in developing the State's case. When an objection is interposed to a question asked by the district attorney, the court can not assist him by asking a proper question,

"but shall simply decide whether or not it be admissible." Code Crim. Proc., art. 729, and authorities there cited.

. 3. First—The corpus delicti is not shown; that is, that Marize Malcek's death was caused by the act of any person. Second—If shown to have been caused by the criminal act of some person, then the evidence fails to show to a moral certainty that appellant, and no other person, committed the act that caused her death. Pogue v. The State, 12 Texas Crim. App., 283; Lovelady v. The State, 14 Texas Crim. App., 545; Kunde v. The State, 22 Texas Crim. App., 65; Dugger v. The State, 27 Texas Crim. App., 95; Pullen v. The State, 28 Texas Crim. App., 119; Willson's Crim. Stats., sec. 1057; 1 Bish. Crim. Proc., sec. 1057.

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant was convicted for the murder of his wife. Murder of the second degree. Ten years in the penitentiary.

Upon the trial the State asked appellant, he being a witness, "Did not your wife bring suit against you for divorce, in Falls County, on the charge of adultery with the woman who staid at your house?" Counsel for appellant objected, because irrelevant and calculated to prejudice him. Appellant answered, "yes." After a very careful examination of the question as to whether this evidence was admissible, we have concluded that it was under the circumstances of this case.

Appellant objected also upon the ground that the petition filed in the case was the best evidence of the grounds of the divorce. . Appellant certainly knew the ground, and could state it without the petition. There was no controversy as to the ground for the divorce.

Appellant contends that the court should have instructed the jury for what purpose this evidence was intended. It was for the purpose of showing the relations between the appellant and his wife—that they were not at all harmonious—and the jury could have considered the evidence for no other purpose.

John Hruska testified that he heard the voice of a woman at appellant's house on the evening before the dead body of deceased was found next morning. Counsel for the State asked witness, "Was the sound you heard a sound of distress?" Appellant objected, because the question was leading and suggestive; whereupon the presiding judge prepared proper questions, in writing, came down from the bench to where the interpreter was sitting, handed him the paper upon which the questions were written, and told him to ask the questions as written. Appellant objected to the questions because they were also leading and suggested the answers. The questions were: "Did the

noise sound as if the person was in joy or distress? Was it as if she was laughing or crying, or if she was suffering pain, or enjoying pleasure? Or was she making a mere idle noise, as if nothing was the matter with her?" Witness answered: "It sounded like a woman's voice, crying." The questions were neither leading nor suggestive of the answers.

Counsel for appellant contend that the conduct of the presiding judge in this matter was calculated to injure the rights of appellant. If the conduct of the judge impressed the jury that he (the judge) was a prosecutor, or that he believed the appellant guilty and was aiding in developing his guilt to the jury, this judgment should be reversed, it being a settled rule in this State that the judge's mouth must be closed against any expression tending to show his opinion of the guilt of the accused. Nor will he be permitted by "his conduct" to exhibit to the jury his opinion that the accused is guilty, nor his opinion as to the truth or falsity or weight of the testimony, nor the credit to be given any witness. Was the conduct of the judge under discussion calculated to impress the jury that he believed him guilty, or that he desired that the accused should be convicted? We think not. The matter sought to be elicited from the witness was important testimony, and it required caution in the questions propounded to him to prevent leading or suggesting to him the answer. The questions written by the judge accomplished the purpose without being obnoxious to either objections.

Counsel for appellant contend that the corpus delicti is not shown; that is, that Mrs. Malcek was dead, and that her death was caused by criminal agency. That she was dead is conceded, but the contention is that the evidence fails to prove that her death was caused by the act of some person. Suicide is not suggested, the contention being that she may have been killed by being kicked by a mule. The mortal wound—that on the head—excludes the mule hypothesis. It was round, about the size of a silver dollar. The blow had driven that portion of the skull directly under the wound, in upon the brain, and caused death. Besides this the throat and neck of deceased were scratched and black when the body was found in the cow pen. The nature of the wound, the condition of the throat and neck, when considered in connection with the fact that the body was found in the cow pen, exclude the theory of suicide, or that she was killed by some agency other than human.

The next contention counsel for appellant make is, that if it be conceded that some person murdered the deceased, still the evidence is insufficient to support the theory that he was that person. The conduct of the parties towards each other was violent indeed, and at times brutal. This state of affairs continued up to the night of the homicide. Appellant had assaulted his wife, for which he had

pleaded guilty; had attempted to beat her on another occasion; threatened that if she did not leave he would kill her. Now, when the facts are considered, in connection with his conduct, when he discovered his wife lying in the cow pen, the conclusion that he was the murderer is very strong. What was his conduct (sworn to himself)? He swears that his wife would get drunk whenever she had the opportunity; that on the night she was killed, he, at her request, had furnished her with the whisky, remarking to her: "Now you have it; if you drink the toddy you won't have it to-morrow." On the next morning, he swears he found her body in the cow pen. What was his conduct there? He says "that he was very much frightened, did not go to or touch her, but went at once to Bartek's to get him to go with him to see if his wife was dead." This is very strange conduct indeed. Why should he be frightened? He knew that his wife would get drunk on any occasion presented; he had supplied her with the whisky; how natural would it have been for him to have supposed her drunk, and not dead? He saw no wounds on her body. Why go to Bartek's at all, until he ascertained that his wife was not drunk, but dead? Such conduct under the circumstances was not that of a sane and innocent man.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.