E. T. McGILL v. The State.

No. 740.   Decided December 21, 1910.

**1.—Murder—Impeaching Witness—Charge of Court—Evidence—Limiting Testimony.**

Where, upon trial of murder, the State sought to impeach one of defendant's witnesses by a grand juror, as to his testimony given before the grand jury, but failed to identify the witness, such testimony was inadmissible either as original or impeaching testimony; and the same being material upon the issue as to who commenced the difficulty, the same was reversible error; besides if the testimony had been admissible it should have been properly limited to the subject of impeachment.

**2.—Same—Mutual Combat—Murder—Manslaughter—Charge of Court.**

Where, upon trial of murder, there was evidence of a mutual combat between the deceased and the defendant, a charge of the court which did not submit the facts that would justify a conviction for murder, and which did not draw the distinction from the evidence between murder and manslaughter was reversible error.

**3.—Same—Rule Stated—Mutual Combat.**

Where parties enter into a fist fight willingly so as to raise the issue of voluntary or mutual combat, and death results, the killing may be either murder or manslaughter or possibly self-defense, and it is reversible error in the court's charge to assume, that as a matter of law the defendant is either guilty of murder in the second degree or manslaughter.

**4.—Same—Charge of Court—Means Used—Deadly Weapon.**

Where, upon trial of murder, the evidence did not show the size of the knife used by the defendant in cutting the deceased or that it was a deadly weapon, the court should have charged Article 717 of the Penal Code, and what it takes to constitute a deadly weapon.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. Robert B. Seay.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Crawford, Muse & Allen,* for appellant.—Upon the question of the court's failure to restrict the impeaching testimony of the State's witness: Wilson v. State, 37 Texas Crim. Rep., 373; Paris v. State, 35 Texas Crim. Rep., 82; Thompson v. State, 29 Texas Crim. App., 208; Foster v. State, 28 Texas Crim. App., 45; Coker v. State, 35 Texas Crim. Rep., 57; Owens v. State, 35 Texas Crim. Rep., 345; Williams v. State, 25 Texas Crim. App., 76; Rogers v. State, 26 Texas Crim. App., 404; Shackelford v. State, 27 S. W. Rep., 8.

Upon question of deadly weapon, and article 717, Penal Code, and court's failure to charge thereon: Snowberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep., 878; Walters v. State, 37 Texas Crim. Rep., 388, 35 S. W. Rep., 652.

On the question of the court's charge on manslaughter under the theory of mutual combat: Renow v. State, 49 Texas Crim. Rep., 281, 92 S. W. Rep., 801; id., 56 Texas Crim. Rep., 383, 120 S. W. Rep., 174; Lee v. State, 54 Texas Crim. Rep., 382, 113 S. W. Rep., 301; Brown v. State, 54 Texas Crim. Rep., 151, 112 S. W. Rep., 80; Snowberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep., 878; Miers v. State, 34 Texas Crim. Rep., 186, 29 S. W. Rep., 1074; Franklin v. State, 34 Texas Crim. Rep., 286, 30 S. W. Rep., 231.

On the question of the court's charge on self-defense: Bell v. State, 20 Texas Crim. App., 445; Brown v. State, 54 Texas Crim. Rep., 121; Snowberger v. State, 58 Texas Crim. Rep., 530, supra.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and given ten years in the penitentiary.

The evidence, in substance, is that appellant and deceased are negroes and were brothers-in-law. They attended a meeting of the Baptist Church, of which they were members, in Queen City Addition, in the city of Dallas. The meeting closed about 11 o'clock at night. Deceased was accompanied by his wife and baby. They went to the church in a buggy. Appellant and his wife went on foot. Immediately after adjournment of the meeting deceased went to and got in his buggy. Appellant and his wife, wife of deceased, carrying

her baby in her arms, and the witness Harroway were together in the street near where deceased was sitting in his buggy when the wife of deceased requested appellant to hold her baby while she got in the buggy. Up to this point there seems to be no divergence in the evidence. Harroway testified for the State that when the wife of deceased asked appellant to hold her baby he replied: "I am not studying your baby." Harroway then proffered to and did take the baby while the wife of deceased got in the buggy. He states further that deceased then said to defendant: "Ed, you don't have to hold the baby." Defendant replied, "Well, you talk like you don't like it." Deceased then said, "I don't like it," and defendant said, "Well, get out of the buggy and let's fight." Satterwhite, who seems to have been the last man to leave the church after he put out the lights, stated that his attention was called to the words of the defendant to the deceased: "If you don't like it, get out of the buggy and fight." The next thing he heard was a woman saying, "Part them, part them; don't let them fight." This seems to be the predicate for the charge given by the court on the theory of mutual combat. According to defendant's evidence he and his wife left the church, started down the sidewalk, saw deceased sitting in his buggy right by the sidewalk, deceased's wife standing near the buggy. That when he and his wife got just about to the buggy deceased's wife said, "Ed, take my baby," and appellant said, "I am not studying no baby; it is late and I am going home." Jesse Harroway then said, "I will take the baby," and he took it, and just as the wife of deceased was getting in the buggy deceased said to his wife, "You are always getting some darn negro to hold that young 'un." He then turned to appellant and said, "Ed, you talk like you are mad," and appellant said, "No, I am not mad." Deceased then said, "You talk like you want to fight," and appellant said, "No, I don't want to fight; I am going home." By that time appellant had reached a point just even with the buggy when deceased reached out and struck him across the head and face, knocking a cigar out of his mouth and his hat off, and jumped right out of the buggy and began fighting appellant. Just as he began striking appellant, after getting out of the buggy, he said, "God durn you, I will kill you." As soon as deceased got out of the buggy he began striking appellant, who commenced backing away as rapidly as he could. Deceased continued after appellant, who backed off diagonally across the street as fast as he could with deceased fighting him. According to appellant's testimony it was further shown that he continued to retreat about seventy-five feet to where the witness Jack Carter was located. None of the State witnesses saw a knife in the hands of defendant. Defendant's witnesses testified that deceased had a knife in his hand during and after the fight. Appellant's side of the case is supported by the testimony of M. T. McGruder, Jim McGruder, Augusta McGill and Jack Carter. It is further shown by one of the witnesses for appellant that when the parties had backed

across the street some seventy-five or eighty feet there was a separation between them, and appellant ran around behind the witness, the deceased following him with his knife. That appellant backed off across the street with deceased following him when they were finally separated. Deceased was cut several times with some sharp instrument supposed to have been a knife. Appellant had a cut on one of his hands, and some other indications of being struck, but not by a knife. This is a sufficient statement, we think, of the evidence to bring in review the questions suggested for revision.

1. The first bill of exceptions shows that the witness Farnsworth was used by the State in rebuttal, and testified he was a member of the grand jury that found the bill and was secretary of that body, and after stating that the case against appellant charged with the killing of a man by the name of Charles Rigsby, which is the deceased's name, was investigated by the grand jury, and that the indictment was returned against appellant by that body, Farnsworth was then asked by the State the following question: "Tell the jury whether or not a man by the name of Jack Carter testified before the grand jury in the investigation of this case," and over objection of appellant was permitted to answer, "Yes, a man by the name of Jack Carter did testify as a witness before the grand jury in the investigation of this case." The bill is full enough to show the environments of that particular situation of the case and discloses that a witness by the name of Jack Carter testified in behalf of appellant; that his testimony was material to appellant. The bill also shows that Jack Carter testified that he was not before the grand jury when the case was under investigation, and had never testified before the grand jury with reference to the matter. Farnsworth did not undertake to identify the witness, who testified in the case as having been before the grand jury, and his testimony is as above stated, simply that a man by the name of Jack Carter testified before the grand jury. There are many exceptions stated in the bill why this testimony was inadmissible. The bill further recites that at this stage of the proceedings that Farnsworth was asked the following question: "State whether or not the said Jack Carter, while before the grand jury at said time, testified that the first blow that was struck in that difficulty was struck after Rigsby got out of the buggy." Many objections were urged to this testimony, all of which were overruled, and he was permitted to answer, "Yes, the witness Jack Carter, who was before the grand jury at said time, testified that the first blow that was struck in that difficulty was struck after Rigsby got out of the buggy." As before stated, this bill of exceptions is quite lengthy, covering several pages, and all sorts of objections are urged to the introduction of Farnsworth's evidence. If Jack Carter was not before the grand jury, his testimony on the final trial could not be impeached by the witness Farnsworth as to what he says a witness, who was known to the grand jury as Jack Carter, had testi-

fied. A witness could only be contradicted on evidence that he gives. There was no attempt to show that this Jack Carter was before the grand jury. Mr. Farnsworth did not know and did not undertake to identify this Jack Carter in any way. So far as this bill is concerned, it may have been an entirely different witness. Therefore, he could not be impeached as indicated. We are of opinion as the matter is presented, that the evidence of Farnsworth was inadmissible to impeach the Jack Carter who testified in the case. He not being the subject of impeachment for the reasons stated, the testimony given by Farnsworth, of course, could not be used as original testimony. If Jack Carter did not testify before the grand jury as he states, and he seems to be uncontradicted, then the statement of Farnsworth would go as original testimony before the jury as to what a witness by that name testified before that body. Farnsworth seems to have kept the minutes of the grand jury, as he was secretary, and the inference from the bill is that he went to these minutes, or had them with him, in order to show that a witness, whose name was written down as Jack Carter, did testify before that body. We think it was error to admit this testimony in the attitude in which the record presents it.

The evidence, however, did go before the jury and was on a crucial point in the case. The evidence for the defendant was to the effect that deceased got out of the buggy and began fighting him, and struck the first lick, and in fact struck the first blow before getting out of the buggy, and after striking that, to use the expression of the witness, he leaped out of the buggy on to the appellant and began beating him and backing him across the street. The Farnsworth evidence is to the effect that Jack Carter stated before the grand jury that the first lick was struck after the deceased got out of the buggy. If this was true, it was a dangerous contradiction of appellant's evidence both as detailed by himself and his witnesses. It was upon a crucial point in the case, and which, if true, practically cut him off from his theory of self-defense. The court failed to charge the jury limiting the effect of this impeaching evidence. If the evidence was admissible for the purpose of impeachment, then the court should have limited its effect in the charge to the jury. It could not be taken as original testimony, and the jury could have easily used it as of a most damaging character and as bearing directly upon the issue of self-defense contradictory of appellant's side of the case. The charge should have been given. Failure to limit Farnsworth's evidence is properly presented for revision.

The court submitted the theory of murder in both degrees, manslaughter and self-defense, also the theory of murder and manslaughter from the standpoint of mutual combat. Among other things, this charge was given: "You are instructed that if the deceased, Charles Rigsby, and the defendant, voluntarily and willingly entered into a combat together with weapons and without intent of said Rigsby to

kill or seriously injure the defendant and without the intent of the defendant to seriously injure or kill the said 'Charles Rigsby, and while said combat was in progress if you find and believe from the evidence that the defendant drew a knife, and that said knife was a deadly weapon; that is, a weapon in its nature and by the means of the use thereof calculated to inflict death or serious bodily injury, and that he did then and there stab and cut the said Charles Rigsby with said knife, and the said Rigsby had not at the time drawn or attempted to use a knife or other weapon then the defendant would not be excused by the law, but would be guilty of murder in the second degree.

"On this point you are further instructed that if Charles Rigsby and the defendant willingly and voluntarily entered into a combat with each other and at the time they so entered into said combat it was the intention of the defendant to kill the deceased, Charles Rigsby, or inflict serious bodily injury on him, and that he did during said combat so cut and kill with his knife the said Charley Rigsby, the defendant would be guilty of murder in the second degree. You are further instructed in this connection that if the defendant and the said Charles Rigsby entered into a mutual combat with each other without deadly weapons, and without the intent on the part of the defendant at the time the combat began to inflict death or serious bodily injury on the deceased, and if you believe that in the progress of said combat the deceased, Charles Rigsby, drew his knife, and that thereupon the defendant did cut and kill the said Charles Rigsby in defense of himself against the said Charles Rigsby, then the defendant is not entitled to the full and perfect right of self-defense, but would be guilty of manslaughter, and you should so find and assess his punishment accordingly."

We are of opinion these charges do not correctly present the law of mutual combat. Where parties enter into a fist fight willingly so as to raise the issue of voluntary or mutual combat, and death results, the killing may be murder or it may be manslaughter, owing to the facts and circumstances attending the homicide. It is not true in all cases that a killing, even with a deadly weapon, would be murder. While neither party might be justifiable, yet it may be murder or manslaughter, and it may be even, under certain circumstances, self-defense. The trouble with this charge is that it does not submit the facts that would justify conviction for murder, nor does it draw the distinction from the facts between murder and manslaughter. A killing such as indicated in the first portion of the charge quoted might or might not be murder, but it is not murder as a matter of law. If the parties entered into the combat willingly to fight with their fists and appellant was actuated by malice or was not actuated by sudden passion, nor defending himself under the law of self-defense, he would doubtless be guilty of murder in the second degree; but, as stated, this is not a matter of law to be charged by the court to

the jury, but the law would apply only when the facts justified such a charge. The jury are to pass upon the moving cause for the homicide, and find the facts which would authorize them to find appellant guilty of murder in the second degree. The mere fact that appellant drew his knife during the fight and stabbed deceased would not authorize the court to charge the jury as a matter of law that it is murder in the second degree. See Foreman v. State, 33 Texas Crim. Rep., 272; Williams v. State, 25 Texas Crim. App., 216, and for collation of authorities see White's Annotated Penal Code, sections 1038-1176-1213. In other words, the court was not justified in charging the jury that appellant was guilty of murder in the second degree as a matter of law under the facts stated in his charge. If appellant killed deceased actuated by malice or under such circumstances as the law would indicate that degree, he would be guilty of that offense, but if actuated by sudden passion, which was engendered by reason of the conduct of the deceased to take advantage of him, or by various reasons that might be suggested under the evidence, he would be guilty of no higher offense than manslaughter. We think upon another trial the court should charge the jury in accordance with the well settled rule announced by the decisions in this State.

Deceased was killed with some sharp instrument supposed to have been a knife, and we infer from the evidence that both parties used knives. Appellant's contention, under his evidence, is that deceased had a knife at the beginning of the fight and undertook to use it on him, and that he did the best he could and that he cut deceased in order to save his own life. There is no description of the knife by any witness as to its size or dangerous qualities, and the only evidence we have in this connection is the bare fact that the party died from the wounds inflicted by it. An exception was reserved in this connection to the failure of the court to instruct the jury with reference to article 717 of the Penal Code, and failure of the court to define what it takes to constitute a deadly weapon. Upon another trial these phases of the law should be given in charge.

For the errors pointed out the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, absent.