## ROSS v. STATE.

(Court of Criminal Appeals of Texas. June 25, 1913. Rehearing Denied Oct. 22, 1913.)

1. INTOXICATING LIQUORS (§ 236*)—CRIMINAL PROSECUTION—SUFFICIENCY OF EVIDENCE.

Evidence, in a prosecution for the unlawful sale of intoxicating liquors, *held* sufficient to warrant a conviction.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. §§ 300–322; Dec. Dig. § 236.*]

2. CRIMINAL LAW (§§ 741, 742, 1160*) — APPEAL—REVIEW—VERDICT—WEIGHT OF EVIDENCE.

In a criminal prosecution, the weight of the testimony and the credibility of the witnesses are questions exclusively for the jury, and the verdict will not be reversed on the evidence, especially where the trial judge has refused to set it aside.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1098, 1138, 1221, 1705, 1713, 1716, 1717, 1719–1721, 1727, 1728, 3084; Dec. Dig. §§ 741, 742, 1160.*]

3. CRIMINAL LAW (§ 706*)—TRIAL—PERMITTING CONSULTATION WITH WITNESSES.

It was not error for the trial court, after the jury had been impaneled and the witnesses sworn and put under the rule, to permit the county attorney to confer for a minute with the only witness for the prosecution before putting him on the stand.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1661; Dec. Dig. § 706.*]

4. WITNESSES (§ 372*)—CROSS-EXAMINATION TO SHOW INTEREST—SIGNING BOND OF ACCUSED.

It was proper to ask on cross-examination of witnesses for the defendant whether they were on his bond in that case, and also whether they had been on his bond before, in order to show the interest of the witnesses.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1192–1199; Dec. Dig. § 372.*]

5. CRIMINAL LAW (§ 673*) — INSTRUCTIONS — LIMITING EFFECT OF EVIDENCE—NECESSITY.

Where such testimony is admitted, it is not necessary, especially in the absence of a request, to charge the jury that it can be considered by them only as affecting the credibility of the witnesses and not as a circumstance against the defendant, since the testimony could not have been considered by the jury for any other purpose.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1597, 1872–1876; Dec. Dig. § 673.*]

6. CRIMINAL LAW (§ 1173*)—APPEAL—HARMLESS ERROR—INSTRUCTIONS.

Under Code Cr. Proc. 1911, § 743, forbidding reversal for errors in instructions not calculated to injure the defendant, the failure of the court to limit the consideration of testimony, admitted to show the bias of witnesses for the defendant, to that purpose, where the testimony could not have been used for any other purpose, does not require reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3164–3168; Dec. Dig. § 1173.*]

Davidson, P. J., dissenting.

Appeal from District Court, Montague County; C. F. Spencer, Judge.

Frank Ross was convicted of unlawfully selling intoxicating liquor in a county in which prohibition was in force, and he appeals. Affirmed.

H. F. Weldon, of Bowie, W. S. Jameson, of Montague, and Seb F. Caldwell, of Austin, for appellant. C. E. Lane, Asst. Atty. Gen., for the State.

PRENDERGAST, J. Appellant was convicted for unlawfully selling intoxicating liquors in Montague county, after prohibition was in force therein, and his penalty fixed at two years in the penitentiary.

[1] One ground of his motion for new trial is that the verdict is insufficient in that the only testimony against him is that of J. H. W. Jones, whose testimony is insufficient in that it shows him to be wholly unreliable and unworthy of belief and that he is a biased witness with no stability or reliability; his statement being wholly unreliable and contradictory and unworthy of credit. Said Jones, for the state, testified: That he lived 2½ miles west of Bowie and knew appellant well. That on Friday, November 15, 1912, he bought a pint of whisky from appellant and paid him $1 therefor. This occurred in a little house where appellant was in a part of the Burns Hotel, in Bowie, Montague county, Tex. That he could not say for certain where appellant got the whisky from at the time, but he thinks he got it out of a box or trunk, or something. His testimony as to his purchase from appellant of this bottle of whisky at this time and place was clear, positive, and pointed. He was then subjected to quite a long and severe cross-examination. He showed that when he bought this bottle of whisky on this Friday he took it home with him that evening; that before or about daylight the next morning (Saturday) he hauled a bale of seed cotton from his home to the gin in Bowie, and that his object in leaving his home as early as he did was to reach the gin in advance of others so as to get his cotton ginned as early as he could; that he took this bottle of whisky with him that he had purchased from appellant the day before and in going to town with the cotton he took a drink out of the bottle of whisky; that he continued to drink out of this bottle until 3 or 4 o'clock in the evening, when, as he expressed it, he got "gloriously drunk" on that whisky in the town of Bowie; that he was prosecuted for getting drunk on this occasion and paid a fine therefor. In the course of this cross-examination and about his getting drunk on this occasion, he testified that it did not take much whisky to make him drunk; "there were two parties; that each drank a dram out of the bottle; but I don't remember who they were. It is true that my memory is not as good as it once was; my memory is bad. As to whether it is not a fact that I cannot hardly trust my memory to these things, will say that sometimes there

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

are things that come up—things that don't concern me to amount to anything—that I won't recollect 30 minutes afterwards; it depends on what they are. Now I told you I was drunk that day; at times I didn't know anything, but at times I did. It is true that I didn't know what I was doing part of the time that day." In his further cross-examination it was developed that some time along in the evening of that Saturday after he got drunk, and while he was drunk, the officers got after him and undertook to then find out from him where and from whom he had gotten the whisky which made him drunk. He tried to keep the officers from finding out these facts. Late in this Saturday evening he again went into appellant's place and then and there got another pint of whisky from appellant; that immediately after he did this and was leaving appellant's place the officer saw him, found this bottle of whisky on him, and the officer took it and then tasted it. The officer then accused him of *buying* this bottle of whisky. from appellant and asked him if he did not buy it from appellant. He denied *buying* it from appellant. It is manifest from the evidence that this was one of appellant's schemes to throw the officers off and prevent them from believing or charging that he had *sold* this whisky to the witness, the object being to induce the witness, when the officers were pressing him, to testify that he did not *buy* this bottle of whisky from appellant, for either that day or the Monday following, it appears that they had him before an officer to induce him to tell whether or not he *bought that bottle* of whisky, and the witness, by his own statement, positively denied to them that he had *bought that bottle* of whisky from appellant but that appellant *gave* it to him or *loaned* it to him; and he adroitly or otherwise limited the investigation of himself at that time to *that bottle* of whisky, and he claims that the officer did not then ask him about the bottle of whisky that he did actually *buy from appellant the day before (Friday).* The evidence further develops that appellant was arrested that night (Saturday night) charged with this offense. It is further shown that the next night (Sunday night) *some one* sent a livery team from the town of Bowie to this witness' home, 2½ miles in the country, and had him that night (Sunday night) brought from his residence back to Bowie, and that he was taken to the livery stable, whence this conveyance then took him, and in effect he was turned over to the liveryman, C. B. Downs, who was one of appellant's two witnesses. There is no intimation any one representing the state sent for him. The circumstances repel that. Downs testified that *some one*, he claimed not to know who it was, just before Jones was delivered to him at his livery stable, phoned him that a party was expected there and as soon as he came to telephone the fact

to Mr. H. F. Weldon, one of appellant's attorneys; and that when Jones arrived he (Downs) did telephone his arrival to appellant's said attorney and at once steered him to this attorney's office and either went with him, just preceded him, or just followed him to said office. Jones testified that, when they got him in this attorney's office that Sunday night, Mr. Weldon asked him if he *bought* a pint of whisky from appellant *on Saturday the 16th*, and wanted to know if he *paid for or bought that particular pint of whisky;* that he told Weldon that he *did not buy nor pay* for *that pint* of whisky; and that Weldon thereupon made out an affidavit to that effect, which he signed and swore to before Weldon. An affidavit was then produced and the witness, after examining it, admitted that that was his signature thereto. The affidavit is, after the state and county: "Before me, the undersigned authority, on this day personally appeared J. H. W. Jones, who after being by me duly sworn on his oath deposes and says that on yesterday, the 16th day of November, 1912, Frank Ross gave to him one pint bottle of whisky, or loaned it to him, and further this deponent says that he never paid the said Frank Ross any sum of money for same, or made him any promise of such payment [and that he has never in his life bought any intoxicating liquors from the said Frank Ross]." Jones then in his further cross-examination testified: "If that (the words in the last of the preceding affidavit above in brackets) was read to me I didn't hear it; I would have ordered that cut off right there; that last part that I never bought any whisky from him, because I know I had and I would not have signed it. I would rather had my right hand cut off than sign that. * * * I wouldn't have signed the statement if I would have understood it, if I would have known that last part was to it." He further shows in his testimony that he thinks he was not then drunk or under the influence of whisky; that he had drunk some that Sunday out of this last bottle that appellant had given him on Saturday. As to that last statement in the affidavit, in further cross-examination, he testified: "As to whether I will swear that Mr. Weldon didn't read this statement over to me just like you did, will say that if he did I didn't hear that last part. If he had read it I would not have signed it; I didn't have to do it that way and I wouldn't have signed it for $500. I wouldn't say that he didn't read it correctly, but if he did I didn't hear it. I could not see what he had written as I couldn't read." The witness further shows that when he went or was taken by Mr. Downs to Mr. Weldon's office on this occasion he didn't know whether Weldon or Downs first mentioned about the whisky to him. "I didn't know what they wanted when I got up there, and they had to start the conversa-

tion; one of them, I think it was Mr. Weldon, said he wanted to see me about that pint of whisky that I got from Ross. I did not tell them that I had gotten a pint of whisky on Friday and that is the reason I said that I would not have signed the statement if that other had been in there. I had no former acquaintance with Mr. Weldon, but I knew him when I saw him. I never had any business with him."

Ed Arledge, one of appellant's two witnesses testified that he was in appellant's house in his room on Saturday evening November 16, 1912, when the witness Jones was there, and that he heard a conversation between Jones and appellant in which Jones got a bottle of whisky from appellant and offered to pay him for it and that appellant said, "No, Mr. Jones, I can't sell whisky. Did I ever sell you any whisky?" and that Jones answered, "No, you never did." This witness, on cross-examination, developed that this occurred some time between 4 and 6 o'clock on that Saturday evening, more particularly between 5 and 6 o'clock; that he went down there on a matter of business and when he got there appellant asked him to have a drink and set a bottle down on a trunk, but Arledge (the witness) then declined to drink and said he came after money. Thus showing by appellant's own witness that appellant had and kept whisky where Jones said he got both pints from him. Jones further testified that since November 15, 1912, appellant had a talk with him regarding this case; that he just asked him one time that he wished "I would go and change some in there."

The witness Jones testified that when he got that bottle of whisky Saturday evening from appellant there was somebody else in the room but he did not recollect who it was. He said that it seemed to him that he and appellant had some talk at that time but he could not remember for certain what was said and could not say that he then offered to pay for the bottle of whisky and that he then told appellant that he never bought any whisky from him. He said that he did not recollect a word of anything of that kind passed; that he could not remember the particulars of what was said "because I was in no shape to remember." In other words, the testimony clearly shows, as stated above, that he was "gloriously drunk" on this occasion and he did not know all what he said or did because of his then drunken condition.

Appellant's witness Downs testified that he was present when the said affidavit was prepared by appellant's attorney, Mr. Weldon, and that after Mr. Weldon wrote it out it was read over to Mr. Jones before he signed it, and that the last clause of that statement was written at Jones' dictation and he read and signed it. He said he *believed* that Mr. Weldon read it to Jones twice.

It is noticeable that notwithstanding the state's witness Jones testified in effect that he did not hear Weldon read the last part of said affidavit shown above, and that if he had so read it he would not have signed it, Mr. Weldon did not testify at all. The record shows that he was present and was one of the attorneys who represented the appellant on the trial of this case in the court below and in this court.

From this record it is clear to me that the testimony of Jones that he bought the bottle of whisky from appellant on Friday, November 15, 1912, was true, and as soon as the officers found him in his drunken condition and began to try to induce him to tell where he got the whisky that he got drunk on, that appellant was made aware of it and immediately set to work to get witnesses to impeach him and to get the affidavit, and did get it, for the purpose of discrediting his testimony before the jury.

[2] The weight of the testimony and the credibility of the witnesses were questions exclusively for the jury. They saw all the witnesses, heard them testify, the manner of their examination and cross-examination, and could better judge of the veracity and truthfulness of their statements than this court can possibly do from a statement of the facts. Twelve fair and impartial jurors on their oaths, after hearing all this testimony, by their verdict say that they believed the testimony of the state's witness Jones, and they were amply justified in doing so. Besides this, the learned judge before whom the case was tried heard all this evidence and reached the conclusion that the jury were justified and authorized to believe the testimony of Jones and refused to set aside the verdict, thereby sustaining the sufficiency of the evidence to justify the conviction of appellant.

[3] Appellant, by his first bill, shows that after the announcements in the case, and after a jury was impaneled and sworn, and defendant had pleaded not guilty, and the witnesses had been called and sworn and placed under the rule, and the court asked the county attorney what witness he would first use, the county attorney asked permission to talk with the said state's witness Jones, who was its only witness. The appellant objected to this; that the court allowed the county attorney to then have a private talk with said witness which lasted not exceeding two minutes. The court, in qualifying the bill, stated that the county attorney stated to the court that he desired to confer with this witness, and the court told him he would give him one minute; that the consultation between the county attorney and the witness did not last exceeding two minutes; that the county attorney had been very busy; that the court felt it was entirely proper for him to have this conference with this witness; and that under the circumstances it was no injustice to permit it. There was no error in this. It was entirely proper, if not his duty under

the circumstances, for the court to permit the county attorney to have this conference with the witness before he put him on the stand.

[4] Appellant has two other bills. One of them, after the style, number of the cause, court, etc., is: "While Ed Arledge was on the witness stand, as a witness for the defendant, and after he had been examined by the defendant's counsel, the county attorney on cross-examination asked said Arledge, after he had testified in answer to the questions of the county attorney that he was on Frank Ross' bond in this case, whether or not he had been on Frank Ross' bond before, and defendant's counsel objected to said question because the same was irrelevant and immaterial and because the same was prejudicial and the proving by said witness that he had been on bonds of the defendant in other cases was a method of bringing before the jury that the defendant had other prosecutions pending against him, and because the state had no right either directly or indirectly to prove or allude to other and different prosecutions, and the court overruled said objections and permitted said witness to answer questions of the county attorney in regard to former bonds, and the said witness then, in answer to the county attorney's question and over objection of defendant, said: 'I am his bondsman at the present time; I think I have been on Frank's bond before this. I could not tell you how often I have been on Frank's bond, but every time he ask me to go on it.' To which action of the court and the admission of the testimony, the defendant then and there in open court duly excepted and asked that said exception be made a matter of record, and it was done accordingly. Approved with same explanation as on bill No. 3."

The next bill (No. 3) is precisely as this, except that it is to the same questions to his said witness Downs and substantially the same answers by Downs. In approving this last bill the court did so with the explanation: "That this witness and W. E. Arledge showed considerable bias in favor of the defendant, and this testimony was admitted to show their feeling in the case, and it nowhere appears what kind of bonds they had signed for defendant. This court does think defendant was prejudged or that the result would have been different but for this." It is perfectly apparent to me that the word "not" was omitted in the last sentence of the judge, following the words "this court does." With the word "not" therein, the former part of the qualification would correspond with the latter, and without the word "not" it does not do so. In all probability this was a clerical error by the clerk in making up this copy. This is rendered more certain by the fact that the clerk, in copying the indictment in the transcript, had it that the appellant was charged with the commis-

sion of the offense "on or about the 15th day of November, A. D. one thousand nine hundred and *thirteen*." This mistake of "thirteen" instead of "twelve" having been called to his attention, he has furnished and there is on file in this court a properly certified copy of the indictment which shows that "thirteen" was a mistake and that "twelve" was the date instead, and the appellant's attorney and the Assistant Attorney General, in the submission of this cause, in effect so stated and agreed before this court. But, however that may be, the evidence objected to was clearly admissible. Earle v. State, 142 S. W. 1182; Pope v. State, 143 S. W. 612; O'Neal v. State, 146 S. W. 940.

[5] The only other assigned error by appellant is this: "The court erred in not instructing the jury that the testimony of C. B. Downs and W. E. Arledge, to the effect that they had signed other bonds for the defendant, could not be used as a circumstance against the defendant."

There is no question, as stated above, but that it was proper cross-examination of appellant's said two witnesses to show by them that they not only were on the appellant's bond in this case but that each had signed other bonds for him, to show their interest in him and in his behalf. As stated by the judge in the qualification of the bill, both of these witnesses showed considerable bias in favor of appellant. There can be no question about this. Mr. Branch in his criminal law has so aptly stated the propositions applicable to this question that we will merely quote three of his texts on this subject:

Section 367: "Testimony does not have to be limited where it can only be used by the jury for the purpose for which it was introduced. Leeper v. State, 29 Tex. App. 69, 14 S. W. 398; Franklin v. State, 38 Tex. Cr. R. 348, 43 S. W. 85; Sue v. State, 52 Tex. Cr. R. 129, 105 S. W. 804; Rice v. State, 54 Tex. Cr. R. 167, 112 S. W. 299; Wright v. State, 56 Tex. Cr. R. 358, 120 S. W. 458; Wilson v. State, 60 Tex. Cr. R. 1, 129 S. W. 614; Malcek v. State, 33 Tex. Cr. R. 20, 24 S. W. 417; Brown v. State, 41 Tex. Cr. R. 233, 53 S. W. 866; Harrold v. State, 46 Tex. Cr. R. 570, 81 S. W. 728."

Section 873: "If impeaching testimony can only be used by the jury to impeach a witness, it is not necessary to charge on the subject at all. Brown v. State, 24 Tex. App. 170, 5 S. W. 685; Magee v. State, 43 S. W. 512; Robinson v. State, 63 S. W. 870; Newman v. State, 70 S. W. 953; Watson v. State, 52 Tex. Cr. R. 90, 105 S. W. 509; Waters v. State, 54 Tex. Cr. R. 327, 114 S. W. 628; Thompson v. State, 55 Tex. Cr. R. 120, 113 S. W. 536; Schwartz v. State, 53 Tex. Cr. R. 451, 111 S. W. 399; Poyner v. State, 40 Tex. Cr. R. 640, 51 S. W. 376; Givens v. State, 35 Tex. Cr. R. 563, 34 S. W. 626; Blanco v. State, 57 S. W. 828."

Section 366: "If impeaching testimony

could be used by the jury for purposes other than impeachment so as to exercise a *strong, undue, or improper*, influence with the jury as to the *main issue*, injurious and prejudicial to defendant, the charge must limit so that no unwarranted results would issue (ensue). Wilson v. State, 37 Tex. Cr. R. 385, 39 S. W. 373; Winfrey v. State, 41 Tex. Cr. R. 542, 56 S. W. 919; Herd v. State, 43 Tex. Cr. R. 578, 67 S. W. 495; McGill v. State, 132 S. W. 943; Maples v. State, 56 Tex. Cr. R. 99, 119 S. W. 105."

Now let us see whether the jury in this case could have used this testimony for any other purpose than to show bias and interest of these two witnesses in appellant, and whether from it they could use it to exercise a strong, undue, or improper influence as to the main issue.

The indictment charges that appellant on or about November 15, 1912, did then and there sell to J. H. W. Jones intoxicating liquors, etc. Nothing whatever is therein alleged about his selling to any one else at any time or place.

The court, in charging the jury, told them, if they believed from the evidence beyond a reasonable doubt that appellant did in Montague county, at the time alleged in the indictment, sell intoxicating liquors to said Jones, to find him guilty and assess his punishment, etc. In the next paragraph he told them, if they did not find and believe from the evidence beyond a reasonable doubt that appellant sold intoxicating liquor to said Jones at the time alleged in the indictment, to find him not guilty. Then in two other paragraphs he told them that the burden of proof was on the state; that the defendant was presumed to be innocent until his guilt was established by legal evidence beyond a reasonable doubt; and if they had a reasonable doubt they would acquit him. Then in another paragraph that they were the sole and exclusive judges of the facts proved, credibility of the witnesses, and the weight to be given to their testimony, but as to the law of this case they will look alone to these instructions and be governed thereby.

The jury was sworn as prescribed by the statute (article 714, C. C. P.): "You and each of you solemnly swear that in the case of the state of Texas against Frank Ross, the defendant, you will a true verdict render, according to the law and the evidence, so help you God."

[6] In my opinion there is no question but that this jury could not have used said testimony for any other purpose than that of affecting the credibility of the appellant's said witnesses, and that it could not be used and was not used by them to exercise a strong, undue, or improper influence as to the main issue submitted and required to be found by the charge of the court in this case. Appellant requested no charge on the subject, and under article 743, C. C. P., I believe this court is required not to reverse this judgment as there is no error appearing therein which was calculated to injure the rights of appellant.

I believe that there is no error whatever in this record and that it should be affirmed, and it is so ordered.

HARPER, J., concurs.

DAVIDSON, P. J. (dissenting). Under my belief and view of the law I cannot concur in the opinion affirming the judgment herein. Appellant, it is true, was convicted of violating the local option law, but I am of the opinion that he is as much entitled to a fair trial in this character of case as he would be if charged with the violation of any other law on the statute books.

The state's witness, Jones, testified that on Friday he bought intoxicants from appellant and on Saturday drank it and got, as he said, "gloriously drunk." For this he was arrested and caused to pay a fine. On Saturday night he went to his residence in the country. He says he got up Sunday morning sober. Sunday evening some one came to his home, whom he accompanied to town. While in town he made the following affidavit: "Before me, the undersigned authority, on this day personally appeared J. H. W. Jones, who after being by me duly sworn on his oath deposes and says that on yesterday, the 16th day of November, 1912, Frank Ross gave to him one pint bottle of whisky, or loaned it to him, and further this deponent says that he never paid the said Frank Ross any sum of money for same, or made him any promise of such payment, and that he has never in his life bought any intoxicating liquors from the said Frank Ross." This was sworn to and acknowledged before H. F. Weldon, a notary public in and for Montague county, and witnessed by C. B. Downs. When confronted with this affidavit during the trial, his mind became confused and very uncertain; in fact, all through his testimony it is made to appear that his mind, to say the least of it, was very forgetful, and that his memory was very deficient about many things connected with the case. He testified that his memory was often at fault, and he did not remember many things. Downs testified that the witness Jones came before Weldon and made the statement above quoted, and that it was made under oath. The state's case is entirely dependent upon the evidence of this witness. I desire to state that no man ought to be sent to the penitentiary or rendered infamous on the testimony of such a witness as this man Jones shows himself to be. A man whose memory is so defective, or, if that memory is good, is so wanting in the elements of truth ought not to be permitted to swear away the life or liberty of a citizen of Texas. If he was induced to make this affidavit and knew it was false, he ought to be held for perjury unless he is insane. If he is irresponsible for

his testimony and was ignorant of what he was stating under oath, his testimony ought not to be used to incarcerate a citizen in the penitentiary. If he knew what he was stating and knew it was false, it may be that he was as well induced to give the other testimony (that is, that appellant sold him the whisky) as he was to make the affidavit quoted, and from any standpoint his testimony ought not to be credited, and a citizen of this state should not be confined in the penitentiary and rendered infamous on such testimony. No man ought to be held guilty of violating any law and the presumption of innocence held to be overcome and his good name as a citizen ruined on the testimony of one who is so careless, indifferent, or irresponsible as this man's testimony and the facts in this record show this witness to be.

While the witness Arledge was testifying in behalf of the defendant, on cross-examination the county attorney asked him if he was not on defendant's bond in this case and whether or not he had been on other bonds for defendant. Various objections were urged to this, among others that it was prejudicial, and that by proving by the witness that he had been on bonds of defendant in other cases was but a method of bringing before the jury that defendant had had other prosecutions pending against him, and because the state had no right, either directly or indirectly, to prove or allude to other and different prosecutions, and the court overruled these objections and permitted the witness to answer the county attorney's questions in regard to these former bonds, and the witness in answer to the county attorney's question said: "I am his bondsman at the present time; I think I have been on Frank's bond before this. I could not tell you how often I have been on Frank's bond, but every time he ask me to go on it." The same matter was reserved in another bill of exceptions in regard to the witness Downs. He answered: "I could not tell how many bonds I have been on for him. It is more than one I suppose; I might have been on as many as half a dozen during my lifetime." The court approves this with the explanation that: "Arledge showed considerable bias in favor of the defendant, and this testimony was admitted to show their feelings in the case, and it nowhere appears what kind of bonds they had signed for defendant. This court does think defendant was prejudged or that the result would have been different but for this." This qualification of the judge intensifies the error. The court

may have intended to say that he did not think appellant's case was prejudged, and he may have intended to say he did not think the result would be different, but he did not say that. We must take the bill of exceptions as we find it. But even if we supply the defect in the judge's qualification and make it read that he did not think defendant was prejudged, or that the result would be different but for this, that is but the opinion of the court. The jury were the judges of the facts and the credibility of the witnesses, and this may have determined the case against the defendant in the face of the evidence of the witness Jones heretofore discussed. It may be doubtful whether or not, under any view of the evidence, these witnesses should have been interrogated or permitted to swear as they did; but, resolving the doubt in favor of the ruling of the court and against the presumption of innocence of the accused in admitting this character of testimony to show the bias and prejudice of the witnesses as being in favor of the defendant, yet from this viewpoint the jury should have been instructed that they could not consider this testimony against the defendant, and that this evidence should only be used as bearing upon the credibility of the witnesses and weight to be given their testimony. Appellant did not take the stand himself and testify, therefore he was not asked about any former prosecutions, and he did not place his character in evidence. The character of the defendant was not involved in the case as an issue before the jury, for he alone could put that in evidence, and this he did not do. The question here is: Having used the fact that these witnesses had been on bonds heretofore in cases against the defendant, this character of evidence could not be used as original testimony, nor could it be used as evidence against the defendant, but could only be used as affecting the testimony of the two witnesses as to their credibility and standing or their partiality and bias in favor of the appellant. The jury should have been carefully so instructed that this testimony might only be used for its legitimate purpose, even if it be conceded it could be used as evidence. These questions were timely presented and urged in bills of exception and in the motion for new trial.

As this record is presented, for the reasons indicated I cannot concur in the affirmance. This judgment ought to be reversed and the cause remanded.